Good morning, your honors. My name is Anderson Gansner, and I represent the appellant in this case, Randy Johnson. This case presents a relatively simple issue. Can police legally seize a vehicle that they see stopped in a loading zone after watching it for only two to three seconds? Now the facts show that early on the night of January 8th, 2014, during the polar vortex winter of two years ago, five police officers in two squad cars surrounded and seized an SUV that was stopped in a loading zone. Specifically, it was stopped within 15 feet of an unmarked crosswalk, an area which under Wisconsin law is designated as a loading zone. The SUV was in front of an open store, its lights were on, and its motor was running, and crucially, the officers admitted to watching that SUV for only a split second before seizing it, a time period of roughly two to three seconds. Now both the law and common sense show that under these circumstances, officers did not have reasonable suspicion to make a stop. Specifically, black letter law provides that officers cannot seize a person based on facts that apply to large portions of the law-abiding public. So for example, officers can't stop every person they see standing on a lawn in a suburban neighborhood for trespassing because that would apply to far too many people. And in this case, they can't stop every vehicle they see in a loading zone just because they don't see activity for two or three seconds. And that's because every vehicle that legally stops in a loading zone is going to have a few periods of inactivity. For example, when I... I gather the problem here is not simply inactivity, but there was no one in the driver's seat. What inference does that support? Well, Your Honor, I, the, excuse me, no officer testified to witnessing the lack of a driver in the seat prior to the seizure. I read the, I was present at the evidentiary hearing, I read the transcript very closely, and there was no testimony that that was observed prior to the seizure, which is prior to the point where the the two squad cars surrounded the vehicle and spotlighted it. But to answer your question more directly, Your Honor, assuming that they had made that observation prior to the seizure, which I don't think the record supports, I think that could cut both ways. I think that that shows that somebody might have hopped out and gone in and made a delivery. It, I think it suggests given the other facts at hand, the fact that the vehicle was running, that its lights were on, that it was in fact standing. Now, turning to kind of my example, what I would give, Your Honor, as an example is, I mean, I drop my wife off at work quite often, and when we do so, we stop in a loading zone. And when we're there, we can't exit immediately. It takes her a while to unbuckle her seat belt. She takes her purse. She makes sure she has everything with her. She says goodbye. She opens the, she unlocks the door and gets out, and that takes far more than two or three seconds. So the observation made by the officers here, it really would apply to any vehicle that ever stops in a loading zone, something that I would imagine everyone in this courtroom has done. We've all been present in a car, in a loading zone, either as the passenger or as the driver, and we know from common experience that it takes more than a few seconds to start unloading, or it takes more than a few seconds once someone gets in the car for you to get moving again, or it takes more than a few seconds when you go in to make a delivery to come right out again. So that is simply not a reasonable basis for a stop here. And I think that's also suggested by the lack of case law that's anywhere close to this situation. And by that, I mean the government has identified no cases in the parking context where such a short period of observation is viewed as okay. I mean, none even come close. The closest I found have dealt with it the length of about a minute, and I believe there's a reason for that. It's because officers enforcing these infractions, they know that it's not reasonable to run up and seize a vehicle in the parking context after watching it for only a couple seconds, because those observations and reasonable suspicion in those kinds of cases, it depends on inactivity and how long that's been going on. It depends on a length of time. So instead, what officers do is they sit back and watch, or they initiate a voluntary encounter like in the Thornton case that was discussed in the briefs, or maybe they drive past and do a U-turn and drive back again. Whatever it is, they extend the observation period so they have a real basis to make a stop, and that wasn't done here. Instead, what the officers did was they swarmed the police car, five of them all at once, surrounding them, ignoring the fact that it was in a loading zone in front of an open store with its lights on and its motor running. They seized the SUV based on facts that would apply to virtually anyone who has ever stopped in a loading zone. Mr. Gassner, I understand your argument to be at least layered to this extent. First, the argument is that the seizure was unjustified on the theory that a violation was reasonably suspected at that point, right? And then there's a further argument, even if it's suspected as a parking violation, that doesn't authorize this sort of full-blown seizure when the police can't even arrest for this violation. Yes, that's correct, Your Honor. I think, sorry. Well, the second at least seems to me to raise questions about some language in our Shields' opinion, and I was wondering if you'd want to address that. Well, Your Honor, Shields, I believe, is relied on by the government to say, you know, it is okay to use a Terry stop to investigate a parking infraction, and we would dispute that. We don't think that's a clear holding of Shields. I think that's an assumption kind of made in Shields where the decision there didn't depend on it. What was at issue there was whether the person who had been stopped and was being questioned by police was in a position where he would have felt free to leave, because he had given his driver's license to the police and they were asking him questions. So I think Shields sort of made that assumption without it being directly addressed by the briefing or raised specifically by the defense. And with regard to my kind of two-tiered argument, Your Honor, so I think the way I would look at it is that when you analyze the general propriety of the Terry stop itself, you have to look at the point of seizure, whether there were facts justifying the stop at that point. I do not think there were, given the brevity of the stop here. But in addition, you look at whether the degree of intrusion was reasonably related to the known facts. And certainly, I think the actions of the officers who did not see any furtive movements, those were extreme actions. They ran up to the car, they opened the door, they shined lights in the faces of the occupants and told them to put their hands in the air. And this was just, they believe they were just investigating a parking infraction at that point. That's very clear from the record. Really? Yes, Your Honor. Or is that a fictional assumption here? Well, Your Honor, that's what they testified to. They said, we were there to investigate a potential parking infraction. Now certainly, this group of officers, I mean, they are out to make as many citizen contacts as possible. What they're interested in doing is talking to people, conducting searches and looking for guns and drugs, things like that. And I think that's the reason they probably stopped the car in this case, was because it was an incredibly cold night and they probably didn't have much to do. And they found one heck of a gun. They did find a gun, Your Honor, yes. A 22-round magazine. That's correct, Your Honor. Was any question raised why there were three police officers in this car? Your Honor, there wasn't a question. I think in the evidence-taking transcript, they said that that was kind of a matter of course for this kind of patrol. They would have these two cars together and they wanted a large amount of officers so they could kind of do an overwhelming stop when they stopped. Thank you. You're welcome, Your Honor. Thank you. Mr. Alexander? May it please the Court, my name is Keith Alexander. I represent the United States. To answer your question, Judge Hamilton, United States v. Shields does control here. It wasn't just assumed. The issue there was a car was parked within a crosswalk and there was an entire paragraph that the court dealt with on that. The squad car pulled parallel to that car, just like it did here. The challenge was that the stop was illegal, amongst other issues in the case. But one of the challenges was that the stop was illegal. This court held it did not violate the Fourth Amendment. It held that the officers had reasonable suspicion. Was that part of the briefing? Was that issue briefed? I looked at the initial brief. The brief did not discuss the question of whether or not there should be a distinction between a moving violation and a parking violation. But there was a challenge to the legality of the seizure. One of the issues in Shields was whether there was a seizure. The court determined that there was. Then there had to be a justification for the seizure, and that's what led the court to have a discussion for about a paragraph about whether or not there was reasonable suspicion for the seizure. So we would hold that United States v. Shields forecloses at least that argument of the appellant. Let's focus on the first part of the argument. Suppose I'm driving a car and I pull over to stop and check a map. I'm lost. I'm answering a phone call, whatever the case might be. You saw the hypotheticals in the defense brief. Is that enough for a SWAT team to surround my car, open the door, tell me to put my hands up, keep me from leaving? Well, first of all, Wisconsin law prohibits stopping within 15 feet of the crosswalk. Suppose I've done that. Okay. So then in that hypothetical, the vehicle has stopped. It's running afoul of the general prohibition within the law. Then the question arises whether or not it falls within the exception to stopping. The exception under the Wisconsin statute here is having the purpose and actually being engaged in loading and unloading items with the passenger. So to answer your question, the officer would have to do that. My question is yes. The SWAT team can surround me, open the doors, shine flashlights in my face, and tell me to put my hands up when all I've done is pull over to take a phone call or check a map. The answer to your question, I think, would be no. They would have a right to seize the vehicle. They would have a right to stop the vehicle. All of the things I just described happened before anybody saw any movement regarding a gun, correct? That's incorrect. The appellant cites the fact that an officer, Officer Kaiser, opens the door first, flashes lights in the faces of the people, in the occupants of the vehicle. The contention at the evidentiary hearing was that that happened first, before Officer Conway, the second officer who saw the gun, directed the defendant out. On page, I think it's 9 and 10 of the magistrate judge's brief, the magistrate judge clearly finds that the record was insufficient to know who opened the door first, whether it was Officer Kaiser or Officer Conway. And in any event, even if Officer Conway opened the door, it was happening so quickly, it was mere seconds, that it wouldn't have made any difference either way. So I would say, Your Honor, that the presumption here that Officer Kaiser opened the door, flashed the lights in people's faces, their hands are open, all before there was a discovery of the firearm, is not a factual finding that the magistrate judge found here. And if this court were to make a finding based on that, it would have to make that factual finding. Is it correct that the burden is on the government to justify the warrantless seizure? That is correct. And you did not show that any of those things happened after Officer... Sorry, I've got the... Kaiser. Not Kaiser, but the other officer. Officer Conway. Conway saw the furtive movements that he described. Well, what the government did meet, and what the factual findings were, was that the vehicle pulls up next to the SUV. Officer Conway is in the back seat of the squad car. He is immediately next to where the defendant, the appellant, is sitting. And as the light is shined in, he immediately sees that the defendant is pulling a gun out of his waistband and trying to hide it. And that's what leads him to direct it. The other part of it is that this happens in a matter of mere seconds. That's part of the defendant's argument here, is that this happens so quickly. Well, that cuts both ways, too, because that... Does state law allow arrest for this offense? No, it does not allow arrest for this offense. So why is a Terry stop justifiable for it? Well, an investigatory traffic stop would be justified. I think there is a distinction there. Well, where you are seizing the vehicle and the people within it. They are not free to leave, correct? That's correct. So if a car has violated, who is liable for the parking ticket? Well, it would be the registered owner. I think it would be the registered owner, although I have to confess, I don't know exactly how a Wisconsin law would... Shouldn't that make a difference here? If state law is violated and somebody other than the driver is potentially liable, why on earth would you stop the driver? Well, to see if it fit one of the exceptions. They have to show that there's a purpose, that they were stopped with a purpose of loading or unloading. Asking the occupants, what's your purpose for stopping here, would be a legitimate question for the officers to make. So that's your theory, that the presence in the loading zone or the no-stopping zone is enough to put the burden on the driver or occupants of the car after they've been seized to justify that they should not get a parking ticket. I'm sorry, can you repeat the question? If I understand your theory, it is... Maybe you're not relying on this. I thought you were relying on the theory that the structure of the statute was that you're not supposed to do this, but there's an exception, and that the burden is on the driver or other occupants to explain that they fall within the exception. Is that right? That's correct, that they have to investigate what the purpose of the stop is. And that the police are entitled to seize the entire vehicle and all occupants while they investigate that terrible crime. Well, we're not claiming it's a terrible crime, one. But yes, they can stop it for minor traffic violations this court has held in a number of instances. In Hine, the Supreme Court's last decision... For parking? Well, in Shields it was a parking violation. There was a seizure in Shields for parking within a crosswalk. So suppose I stop in the middle of the street for people crossing in the crosswalk. Have I violated the statute? Well, it would depend on the circumstance. I think if you're stopping and somebody's walking across... Would you have reasonable suspicion to seize me? Well, if the officer's seeing somebody walking across a crosswalk and that's what you're stopping for, then I would say, no, he wouldn't have reasonable suspicion. You know, if somebody's over on the side, you're kind of in that, you know, waving at each other. You go ahead, no, you go ahead. The officer can't see any of that. Can he still seize everybody? Well, again, if they're waving at somebody to walk ahead across, and that would not justify, I think, a stop. But that's not the circumstance here. Here they didn't see anybody outside the vehicle. The doors were closed. It was clearly stopped well within the 15 feet. And a reasonable suspicion standard doesn't mean that the officers have to conclude for sure that there's a violation. They don't need to eliminate all innocent explanations. Could you address the Hensley test that the defense has briefed? Yes, Your Honor. I think that the magistrate judge and the government addressed the Hensley test, which essentially is a balancing test between the intrusion made with the government interest here. And the government interest, the intrusion made for just the parking violation was pulling a vehicle to the side of it and behind it and flashing a light in it for a few seconds. That is a minimal intrusion. When Officer Conway sees the gun... I'm sorry, you say that's a minimal intrusion? When they pull it next side to it and behind it. And block it in. And they are not free to leave, correct? They did not pull in front of the vehicle. They are not free to leave, are they? It was a seizure, that's correct. It was a seizure of the vehicle. So they have been seized because of a parking violation. It was stopped. It was a seizure to stop them from moving ahead so they could ask a couple questions. That stop was for a mere second. The additional intrusion of directing the defendant outside of the vehicle, putting your hands up, or handcuffing him was when Officer Conway saw the firearm. I also think it's important to note here... We see a lot of Fourth Amendment cases. This is one of the most extreme cases of tactics to justify harassment. I know you found a gun this time. But if suspected parking violations are enough to justify this sort of tactic, I don't see why everybody on the street, any driver isn't subject to just being stopped, essentially at will. I mean, this is extraordinary. I think it's very clear to make sure we don't conflate the analysis. They did not harass anybody. It was very quickly Officer Conway sees a gun. Who gets seized this way for a parking ticket, a potential parking violation? Well, the defendant in Shields. It was a seizure for a parking violation. This court upheld it as not running afoul of the Fourth Amendment. And the Supreme Court has said a number of times, including Maryland v. Wilson, that a roadside encounter in an extremely high-crime neighborhood as this was is an inherently dangerous situation. And so much so that they can direct occupants out of the vehicle with nothing more than the traffic violation. So, I mean, I understand we have to accept pretextual stops, but the pretextual stops have to have a sound legal basis, and I don't see it. Well, again, Your Honor, I would rely on the fact that Wisconsin law prohibits generally stopping within 15 feet of a crosswalk. They didn't see any evidence justifying the exception. It didn't take a moment to stop, to even ask that question, right? But it doesn't take long to see a vehicle stopped well within 15 feet. There was a lot of lights. There was a couple headlights in the street at the time. So they can make that determination very quickly. They could see very quickly that there's nobody outside the vehicle, that the doors are not open, that they're closed, so there's no loading and unloading. The officer said he was trained... Let's take Mr. Gansner's example of stopping to let his wife out of the car. Are they entitled to do that to him while they're stopping to let her gather her things to get out of the car? Your answer has to be yes, doesn't it? If him or I or anybody was parked within 15 feet of a crosswalk and we're stopped there and the doors are closed, the officers can pull up and ask me a quick question. Trap your car, shine the lights, open the doors, hands up. For a few seconds. They pulled parallel behind it, not in front of it. They did not pull in front of it, so they weren't... I'm not sure what country we're talking about here, but okay, go ahead. Well, again, we're talking about a few seconds of asking the question, what are you doing here? If there's an innocent explanation for it, then the officers have to move on. The officers then cannot pull the person out, handcuff him. The gun is what caused that behavior here by the officers. No doubt about that. Just one question. I want to make sure I understand the facts. When they pull up parallel, is no one in the driver's seat? There is no one in the driver's seat, but Mr. Gansner is correct. I looked at the record as well. There was no testimony that the officers saw in advance that somebody was in the driver's seat. They discovered that when they stopped the vehicle. Well, the vehicle was stopped. They pull up parallel. That's correct. They look, I assume, to the right, because the car is at the curb. That's correct. So they can see if someone's in the driver's seat, right? That's correct. And it's at that point that they, I think, notice it. One of the officers does. But my point is that I want to be clear that the officers, when they are driving up that northwest road and see the car parked south on the other street, they did not see at that time that nobody was in the driver's seat, if that makes sense. So that is to say that that was not part of their decision. But you're right. When they pulled up next to the vehicle, I think it was Officer Kaiser. That's when the stop or seizure occurs, when they pull up parallel, right? That's correct. When they pull up parallel and they look at the car, I assume immediately to the right, is when they see there's no one in the driver's seat. That's correct. All right. Yes. Thank you, Mr. Alexander. Thank you. Mr. Ganser, do I have that right? Your Honor, I can clarify that. I was at the event and I cross-examined several of the officers. None of them testified to seeing that the driver's seat was empty until they had already exited the vehicle, until they were out and approaching. I'm just not tracking this. At some point, the subject vehicle is stopped. Yes, it's surrounded by the vehicle. I don't want to get into the crosswalk. We'll assume it's creating a parking violation by being in a stoplight. They pull up parallel. I think the officer driving the front car said parallel and a little bit in front of. So I think he might have had to look at that. Okay, whatever. I assume they immediately look to their right, right? I would assume that as well. All that I would say, Your Honor, is that no one testified specifically to noticing that the driver's seat was empty until they were out of the car. There's just a disconnect for me. I don't understand how a hearing could occur where the issue is, part of it being whether this car has caused suspicion beyond just a parking violation, to know whether with the exhaust on, whether there's somebody sitting in the driver's seat. That's not clear from the hearing? If we look at the transcript, that's not clear from the hearing? That someone's in the driver's seat? No, Your Honor, I don't believe it is. Again, this is a burden that the government bears to justify the basis for a warrantless stop, and that question wasn't asked. I think what they were focusing on was the credibility of Officer Conway, claiming he saw movement and whether there was a violation at all. Assuming at some point it's determined there is nobody in the driver's seat, what happened to the driver? Is the hearing evidence whether the driver returned to the car? I could speak to that, Your Honor. It's in the discovery. It wasn't addressed at the hearing. If the court allows me, the person had run into the store. The person's what? The driver had run into the store. Yeah, that's what I assumed. And he came back out. If I could respond to a couple other points real quickly. Sure. I would describe the situation of Wisconsin law in terms of whether you can stop or park in a loading zone. It's not an exception. It's either one thing or the other. If you look at the definition of Wisconsin law, parking means halting your vehicle without loading, and standing means the temporary halting of a vehicle, whether occupied or not, suggesting you can leave your vehicle while you're loading to go into a store, for example, Your Honor, as long as you're actively engaged in loading and unloading. If this court has no further questions, then I would ask that the court reverse the district court and grant the motion to suppress. Thank you, Mr. Alexander. The case is taken under advisement, and the court will stand in recess.